UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JOSHUA SMOLA,

     Plaintiff,

v.                        CASE NO. 8:22-cv-2383-SDM-JSS

CHAD CHRONISTER and
JACK THOMPSON,

     Defendants.

_____/

## ORDER

     Alleging that during an arrest a Hillsborough County Sheriff's deputy, Jack Thompson, kicked Joshua Smola in the back while Smola was kneeling on the ground with his hands raised, Smola asserts against Thompson, in his individual capacity, a Section 1983 claim and asserts against Hillsborough County Sheriff Chad Chronister, in his official capacity, a battery claim under Florida tort law.[1]  Thompson and Chronister move (Docs. 28 and 29) for summary judgment.  Smola responds (Doc. 32) to each motion, and Thompson and Chronister reply (Doc. 34).

### BACKGROUND

     In a stolen car and with a passenger who was wanted for a separate theft, Smola drove to an unspecified location where his passenger intended to sell drugs.

---

[1] This is the second action in which Smola sued Thompson based on the kick. In 2019, Smola sued Thompson and the Hillsborough County Sheriff's office and requested, among other things, $2,000,000.00 and the dismissal of all Smola's criminal charges. *Smola v. Thompson*, 8:19-cv-1789-VMC-TGW (M.D. Fla.). A 2020 order dismisses the action because of Smola's failure to prosecute the action.

Because something "just seemed off," Smola and his passenger aborted the drug deal.  Believing that he "picked up a tail," Smola decided to drive to the house of some friends.  Smola was correct about the "tail."  Intending to arrest Smola's passenger, several Hillsborough County Sheriff's deputies in unmarked cars followed Smola.

When he arrived at his friends' house, Smola backed the car into his friends' yard, and both Smola and his passenger exited the vehicle.[2]  Despite his status as a felon, Smola carried a gun between the small of his back and the waistline of his pants and carried in his pockets a knife, twenty-one grams of methamphetamine, more than a gram of heroin, and two Alprazolam pills.  Several unmarked cars stopped in front of the house, and several deputies wearing vests labeled "SHERIFF" exited the cars and entered the yard to arrest Smola's passenger.  Seeing the cars arrive in front of the house, Smola walked toward the rear of the car.  Entering the yard from the side opposite Smola and the car, Thompson began loudly commanding Smola to "put your hands up" and walked quickly across the yard toward both Smola and the rear of the car.  Rather than raise his hands, Smola, who saw the deputies approaching, stepped behind the car.  Smola pulled his gun from behind his back and, bending down, tossed the gun under the car and near the right-rear tire.

---

[2] A home-security camera recorded the events. In accord with *Scott v. Harris*, 550 U.S. 372, 381 (2007), the evidence and allegations about the events that occurred in the yard are "viewed . . . in the light depicted by the video[]."  The other facts and evidence are construed favorably to Smola.

Smola claims that the car obscured the deputies' view of Smola's tossing the gun under the car.

Although the parties agree that Smola had a gun and that he pulled the gun from behind his back, the parties dispute whether any of the deputies saw the gun before Smola threw the gun under the car. Smola contends that no deputy saw the gun until the deputies placed both Smola and his passenger in handcuffs. Thompson contends he could see Smola remove a gun from behind his back as Smola ducked behind the car. The video shows that while he moved behind the car Smola removed the gun from behind his back and that while behind the car Smola bent down and tossed the gun under the car. However, the video cannot establish whether Thompson or any other deputy could see the gun as Smola removed the gun from behind his back and tossed the gun under the car (both actions are visible on the surveillance video). The video is inconclusive as to what the deputies saw, and the allegations are construed most favorably to Smola.

Seeing Smola step behind the car, Thompson hurried to the rear of the car. By the time Thompson arrived at the rear of the car, Smola had tossed the gun under the car and had begun to back away from the car and the deputies. Thompson shouted at Smola to "get on the ground." While backing away, Smola raised his hands. Thompson neared, and Smola slowly kneeled on the ground. Thompson moved to Smola's side and kicked Smola across his lower back. Smola went to the ground. While Thompson stood over Smola, another deputy handcuffed Smola. Less than twenty seconds elapsed between the deputies' arriving and the deputies' handcuffing

Smola.  After securing Smola and his passenger, the deputies searched Smola, the passenger, and the car.  The deputies found the drugs and the knife in Smola's pocket and found the gun on the ground under the rear of the car.

While Thompson apprehended Smola, another deputy, Julie Seale, arrested Smola's passenger.  When the deputies entered the yard, the passenger stood next to the passenger side of the car.  Seale entered the yard and loudly commanded the passenger to "lay on his stomach and put his hands out."  (Doc. 29-5 at 20)  Seale reports that, when she arrested the passenger, Seale was within twenty feet of Smola who according to Seale likely heard Seale's commands to the passenger.  Smola denies hearing any command from Seale.

According to Smola, he felt no immediate pain after the kick and after he was handcuffed.  The deputies photographed Smola's back, but the photo reveals no visible injury.  (Doc. 29-7 at 25)  While handcuffed in the backseat of one of the deputy's cars, Smola reportedly began experiencing back pain.  An x-ray revealed that Smola had a broken rib and a laceration on his spleen.  Smola received no treatment other than "pain management" and rest, and Smola incurred no medical bills.  Smola reports a lingering numbness in two fingers, but no medical provider attributes the numbness to the kick.  (Doc. 29-1 at 112–14)

## ANALYSIS

Smola asserts two claims, each based on Thompson's kick.  Smola asserts against Thompson a claim under 42 U.S.C. § 1983 and alleges that Thompson's kick constitutes "excessive force" that violates the Fourth Amendment.  Smola asserts

against Chronister a claim for battery under Florida tort law and alleges that Thompson's kick was "unreasonable and excessive under the circumstances."  Smola alleges that Thompson "committed the [kick] . . . while acting within the course and scope of his employment . . . ."  Because he alleges that Thompson acted within the scope of his employment, Smola, in accord with Section 768.28(9)(a), Florida Statutes, asserts the battery claim against Chronister, Thompson's employer.

## I.    Excessive force claim against Thompson

Thompson enjoys qualified immunity from Smola's claim under Section 1983 unless Smola establishes both (1) that Thompson violated a federal statutory or constitutional right and (2) that the violated right "was 'clearly established at the time.'" *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018).  Although a law-enforcement officer may exercise "some degree of physical coercion or threat" to arrest a suspect, the Fourth Amendment prohibits an arresting officer's using "excessive force," that is, "unreasonable" force.  *Graham v. Connor*, 490 U.S. 386, 394–96 (1989); *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) ("[T]he typical arrest involves some force and injury."); *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002).

The force used by an arresting officer is evaluated "from the perspective of a reasonable officer on the scene," and the evaluation must recognize that officers "are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation."  *Jackson v. Sauls*, 206 F.3d 1156, 1170 (11th Cir. 2000) (quoting *Graham*, 490 U.S. at 396–97).  An arresting officer's force is not "excessive" if the

- 5 -

force is "'objectively reasonable' in light of the facts and circumstances confronting" the officer. *Graham*, 490 U.S. at 397. Informing the "reasonableness" of the arresting officer's force are factors such as the severity of the crime, the threat posed by the suspect, the suspect's resisting arrest or otherwise attempting to flee, the need for the force, the balance between the need for force and the amount of force used, and the extent of the injury inflicted. *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015); *Graham*, 490 U.S. at 396.

In *Mobley*, 783 F.3d at 1350–51, the suspect struck a police officer with a truck and led officers on a chase that ended when the suspect waded into a retention pond. When the suspect emerged from the pond, the waiting officers threw him to the ground and repeatedly struck, kicked, and tased him until he placed his hands behind his back. *Mobley* affirms a summary judgment for the arresting officers and states that "force applied while the suspect has not given up and stopped resisting and may still pose a danger to the arresting officers, even when that force is severe, is not necessarily excessive." *Mobley* suggests that the "point at which a suspect is handcuffed and 'pose[s] no risk of danger to the officer' often is the pivotal point for excessive-force claims."[3]

---

[3] Although an arresting officer's using force after a suspect is handcuffed often militates in favor of a conclusion that the officer used "excessive force," force applied after handcuffing might remain "reasonable" if the handcuffed suspect continues to struggle or resist. *Charles v. Johnson*, 18 F.4th 686, 691–93, 704 (11th Cir. 2021) (affirming summary judgment for an officer who tased a handcuffed suspect and noting that the suspect "actively resisted" despite the handcuffs). In contrast, if a non-handcuffed suspect complies with the arresting officer's commands and presents no danger to the arresting officer or others, the officer might apply "unreasonable" or "excessive" force despite the suspect's remaining free from handcuffs. *Stephens v. DeGiovanni*, 852 F.3d 1298 (11th Cir. 2017) (denying summary judgment for an officer who repeatedly struck an unarmed and compliant suspect even though the suspect remained free from handcuffs.

Partial or momentary compliance does not compel the conclusion that force is excessive, especially if the arresting officer perceives the suspect as dangerous.  In *Prevatt v. City of Gainesville*, 657 Fed. Appx. 905 (11th Cir. 2016), several people called 911 and reported that a man with a gun was walking near an elementary school. Two officers found the man, Prevatt, and ordered him to drop his gun.  Prevatt tossed his gun (an air rifle designed to shoot BBs) on the ground.  The officers noticed also that Prevatt carried two knives and ordered Prevatt to drop the knives. Prevatt tossed the knives on the ground.  The officers ordered Prevatt to raise his hands in the air and to drop to the ground.  Instead of complying with the order, Prevatt turned and moved several steps away from the officers, who began to run toward Prevatt.  When the officers neared, Prevatt raised his hands, but "almost simultaneously" the officers tackled Prevatt, who fell face-first onto the sidewalk and sustained "serious injuries."  Approximately eleven seconds elapsed from the time the officers exited their vehicle to the time the officers tackled Prevatt.  Although Prevatt complied with some orders, although Prevatt raised his hands immediately before the officers tackled Prevatt, and although Prevatt claimed that he intended to comply with the order to drop to the ground, the officers reasonably perceived Prevatt's moving away as non-compliance.  Consequently, the force was "constitutionally reasonable" and violated no "clearly established" law.[4]  *Prevatt*, 657 Fed. Appx. at 908–09.

---

[4] Because *Prevatt* is an unpublished decision, *Prevatt* is not binding. However, *Prevatt* and other unpublished decisions are persuasive authority, and *Prevatt* presents similar facts.

If, however, a suspect presents no danger to the arresting officer — and especially if a suspect is handcuffed or completely compliant — even a single strike might constitute excessive force.  In *Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008), a suspect, who was under the influence of cocaine, entered a supermarket and began yelling and knocking items from the shelves.  Two officers arrived at the supermarket and ordered the suspect to freeze.  The suspect immediately complied, and the officers handcuffed the suspect.  While the officers led the suspect from the store, the suspect began "asking for Jehovah's protection."  Although the suspect was handcuffed and was not resisting arrest, one of the officers punched the suspect in the stomach.  The punch constituted excessive force because the suspect "neither resisted arrest nor posed a danger to [the officer] sufficient to warrant" the punch.  *Hadley*, 526 F.3d at 1330, 1334.

Even if a suspect is initially non-compliant and even if a suspect is not handcuffed, an arresting officer's force might constitute "excessive force" if the suspect is compliant when the officer uses force and if the force used is unnecessary to effect the arrest.  In *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997), an officer who was a member of a drug task force entered the front yard of the suspect's mother.  The suspect, who was sitting at a picnic table in the front yard, threateningly raised a baseball bat.  The officer drew his gun and told the suspect to drop the bat.  At first, the suspect declined to drop the bat.  But after the officer threatened to shoot, the suspect dropped the bat and ran into the street.  The suspect decided to return to his mother's house, but the suspect again met the officer.  The suspect pretended to run, but the

suspect "docilely submitted to arrest" after the officer told the suspect to "get down."
The officer placed a knee on the suspect's lower back and pulled his arm behind his
back.  "[W]ith a grunt and a blow," the officer broke the suspect's arm.  Because the
suspect offered no resistance and because the officer's breaking the suspect's arm
constituted excessive force, *Smith* affirmed the denial of summary judgment for the
officer.  127 F.3d at 1420.

　　　　These decisions establish a guide to determine the "reasonableness" of an ar-
resting officer's force.  Force — even severe force — is "reasonable" to arrest some-
one who is actively resisting or who poses a danger to an officer.  For example, each
suspect in *Mobley* and *Prevatt* fled, ignored commands, or otherwise actively resisted
arrest, and each suspect's non-compliance with an order created the distinct impres-
sion of danger to the arresting officer.  In contrast, force is "unreasonable" (1) if the
force is used on a completely compliant person, especially a person who presents no
danger to the arresting officer or who is handcuffed, or (2) if the force is unnecessary
to control a suspect or is unreasonably disproportionate to any non-compliance.  For
example, the suspect in *Hadley* complied immediately with the officers' instructions
and posed no danger to the officers.  Although the suspect in *Smith* initially fled, the
officer used no force until the suspect submitted to arrest and laid on the ground.
Also, in *Smith*, the force that the officer used was not needed to arrest the suspect and
was disproportionate to the resistance at the time the officer used force.

　　　　In this action, the video offered by the parties depicts a tense twenty seconds
in which deputies rushed to secure both a suspect for whom the deputies had an

arrest warrant and an unknown associate (Smola), who stepped behind a car as the deputies entered the yard. Smola states that he heard no commands other than "get down" and that when he heard "get down" Smola immediately dropped to his knees. (Doc. 29-1 at 73–75) But Smola acknowledges that while approaching Smola the deputies were yelling at him. (Doc. 29-1 at 73) Thompson and other deputies at the arrest state that when the deputies first entered the yard Thompson began shouting commands, including "put your hands up," and that Smola refused to comply. (Doc. 29-2 at 31–32; Doc. 29-4 at 6–7; Doc. 29-5 at 12) The video includes no sound but shows Smola move behind the car and bend down and away from the deputies' line of sight. After stepping behind the vehicle and tossing the gun beneath the car, Smola backs away from the deputies and kneels only after Thompson and another deputy approach with their guns aimed at Smola. Smola's stepping behind the car creates an impression of his retreating from the deputies (or otherwise moving to conceal something from the deputies), and Smola's retreat shows that he failed to im-mediately comply with the deputies' command.

Smola argues that "even if Smola's concealment of the firearm could be de-scribed as momentarily non-compliant," Smola was complying when Thompson kicked Smola. But less than ten seconds elapsed between Smola's tossing the gun under the car and Thompson's kicking Smola, and less than three seconds elapsed between Smola's kneeling on the ground and Thompson's kicking Smola. Like in *Prevatt*, Smola's partial compliance immediately preceding Thompson's use of force does not compel the conclusion that Thompson's kick was "excessive" and

"unreasonable."  Rather, Thompson used a kick to induce Smola to lie prone on the ground, a position from which Smola could not grab a weapon and from which the deputies could handcuff Smola.

Thompson's inducing Smola to lie prone appears "objectively reasonable" under the circumstances.  While kneeling with his hands free, Smola could have quickly reached his pocket or fled, but while prone Smola could not easily reach his pocket or flee.  Thompson's kick is a "reasonable" means to induce Smola to lie prone and to mitigate any threat presented by Smola while the deputies located any weapon or illicit paraphernalia that Smola might have concealed while not in the deputies' field of view.  Consistent with *Graham*, 490 U.S. at 396–97, this order declines to second-guess from the "peace of a judge's chambers" Thompson's "split-second" decision to use force in a "tense, uncertain, and rapidly evolving" situation.  Although the deputies entered the yard without the intent to arrest Smola and although Smola sustained an injury, the balance of the factors identified in *Mobley* and *Graham* militate decisively in favor of the conclusion that Thompson's use of force was "objectively reasonable" in the circumstances of Smola's arrest.

In any event, the law is not "clearly established" that a deputy's using a single kick in circumstances in which the arresting deputy perceives a danger constitutes a "constitutionally excessive" use of force.  *See Baker v. Clements*, 760 Fed. Appx. 954, 958 (11th Cir. 2019) (citing *Wesby*, 583 U.S. at 62–64).  Rather, *Prevatt* — a factually similar decision involving a tense, rapid encounter with a suspect whom the arresting officer perceived as non-compliant — affirms summary judgment for two officers

- 11 -

who tackled, and caused serious injury to, a suspect who immediately before the tackle had begun to comply.

Smola cites several decisions denying qualified immunity to an arresting officer who used force that violated a "clearly established" right, but the decisions cited by Smola, decisions similar to *Hadley* and *Smith*, support the conclusion that force is "excessive" if the force is "gratuitous" and if the officer uses the force on "a suspect who is under control, not resisting, and obeying commands." *Richmond v. Badia*, 47 F.4th 1172, 1184 (11th Cir. 2022) (quoting *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014)); *Ingram v. Kubik*, 30 F.4th 1241, 1252 (11th Cir. 2022); *Stryker v. City of Homewood*, 978 F.3d 769, 775 (11th Cir. 2020); *Patel v. City of Madison, Alabama*, 959 F.3d 1330, 1343 (11th Cir. 2020). *Hadley*, *Smith*, and the other decisions cited by Smola are readily distinguishable from this action. Until Thompson approached, Smola was slow to comply either with the initial command to raise his hands or with the later command to drop to the ground, and when Thompson kicked him, Smola was not "under control." Smola was still upright and with his hands in the air rather than prone and on his face with his hands behind his back (and with Smola's gun still not found and secured). Again, like in *Prevatt*, Smola's partially complying by kneeling and raising his hands seconds before the kick does not necessarily compel the conclusion that the kick is "excessive." Smola went to the ground with his hands behind his back only after the kick, and Smola's gun was located and secured only after the kick.

Thompson's kick, evaluated from "the perspective of a reasonable officer on the scene," neither constitutes "excessive force" under the Fourth Amendment nor violates a "clearly established" right.  Thompson enjoys qualified immunity from liability on Smola's claim under Section 1983.

## II.   Battery claim against Chronister

A.   <u>Immunity</u>

Chronister contends that he enjoys immunity from Smola's battery claim and that Smola must assert the claim against Thompson.  A plaintiff asserting a Florida tort claim cannot sue an "officer, employee, or agent of the state . . . unless [the] officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."  Section 768.28(9)(a), Florida Statutes, explains:

> The exclusive remedy for injury or damage suffered as a result of an act, event, or omission of an officer, employee, or agent of the state or any of its subdivisions or constitutional officers is by action against the governmental entity, or the head of such entity in her or his official capacity, or the constitutional officer of which the officer, employee, or agent is an employee, unless such act or omission was committed in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

In other words, Chronister, the sheriff, is liable for any tort, negligent or intentional, by a deputy unless the deputy's tort is "committed outside the course and scope of [the deputy's] employment or unless the [deputy] was acting in bad faith or with a malicious purpose or in a manner exhibiting wanton and willful disregard of human

rights, safety, or property." *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987).

Alleging that Thompson was acting within the scope of his employment when Thompson kicked Smola, Smola asserts the Florida battery claim against Chronister, not Thompson. Chronister contends that, if Smola's allegations are true, Thompson had "no legal or justifiable reason" for the kick and that the kick "was unreasonable and excessive under the circumstances." Chronister concludes that Smola cannot assert the battery claim against Chronister because "a reasonable trier of fact could find [that Thompson's use of force] was in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights, or safety." (Doc. 28 at 20)

But an allegation that a use of force was "unreasonable" is not equivalent to an allegation that a use of force was "committed in bad faith," committed with "malicious purpose," or committed in "a manner exhibiting wanton and willful disregard of human rights, safety, or property." *Gualtieri v. Bogle*, 343 So. 3d 1267, 1274 (Fla. 2d DCA 2022). A deputy can improperly exercise the deputy's authority without acting "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." *McGhee v. Volusia County*, 679 So. 2d 729, 731–32 (Fla. 1996). A deputy "clearly ha[s] the lawful authority to restrain arrestees, detain them, or even respond with force in appropriate situations." *McGhee*, 679 So. 2d at 733. Indeed, Smola admittedly declines to allege that Thompson "acted in bad faith, with malice, or in willful or wanton disregard of Smola's

human rights[.]"  (Doc. 32 at 21)  And Smola expressly asserts his claim against Chronister, not Thompson.[5]  *See McGhee*, 679 So. 2d at 733 ("In any given situation either the agency can be held liable under Florida law, or the employee, but not both."); *Richardson*, 511 So. 2d at 1124.

B.    Florida Battery Standard

A person commits battery if the person intentionally "inflict[s] [] a harmful or offensive contact upon another."  *Paul v. Holbrook*, 696 So. 2d 1311, 1312 (Fla. 5th DCA 1997).  But "a presumption of good faith attaches to an officer's use of force in making a lawful arrest[,] and an officer is liable for damages only where the force used is clearly excessive."  *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996).  A battery claim against an arresting officer is analyzed by determining "whether the amount of force used was reasonable under the circumstances."  *Sanders*, 672 So. 2d at 47.  Under Section 776.05, Florida Statutes, an officer may use "any force . . . [w]hich [the officer] reasonably believes to be necessary to defend [the officer] or another from bodily harm while making the arrest[.]"

The parties contend that the standard for what force is "clearly excessive" under Florida battery law is "virtually identical" to the "excessive force" standard used

---

[5] If Smola asserted the battery claim against Thompson instead of Chronister, the question of whether a deputy acted "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property" requires a "fact-specific" evaluation and consequently is often better resolved at trial. *Butler v. Gualtieri*, 41 F.4th 1329, 1337 (11th Cir. 2022) (citing *Peterson v. Pollack*, 290 So. 3d 102 (Fla. 4th DCA 2020) and citing *Thompson v. Douds*, 852 So. 2d 299 (Fla. 2d DCA 2003)). An allegation that a deputy used excessive force to arrest a suspect "[a]t a mimum . . . present[s] a factual question as to whether [the deputy] acted in bad faith, with malicious purpose, or in a willful and wanton manner that should be decided as the case moves forward." *Gualtieri*, 343 So. 3d at 1274.

to evaluate a Fourth Amendment claim, such as Smola's Section 1983 claim. But the parties identify no binding decision holding that the standards are equivalent. Some non-binding decisions from district courts in the Eleventh Circuit hold that, because "the right under the Florida Constitution to be free from unreasonable searches and seizures is construed in lockstep with the Fourth Amendment to the U.S. Constitution, the 'excessive force' analysis for a battery claim is identical to the 'excessive force' analysis under the Fourth Amendment." *Noel v. Arias*, 460 F. Supp. 3d 1318, 1331 (S.D. Fla. 2020) (quoting *Cordoves v. Miami-Dade Cnty.*, 92 F. Supp. 3d 1221, 1238 (S.D. Fla. 2015)); *Baxter v. Hendren*, 2023 WL 3990215 (M.D. Fla. 2023), *appeal pending*, No. 23-11902 (11th Cir.).

These decisions cite no controlling decision from any Florida state court and instead rely on *Sullivan v. City of Pembroke Pines*, 161 Fed. Appx. 906 (11th Cir. 2006), an unpublished and non-binding decision. In *Sullivan*, an officer arrested a woman by grabbing her arm and forcing her to the ground. The woman asserted against the arresting officer a Section 1983 claim and asserted against the city a battery claim under Florida tort law. *Sullivan* determined that the officer enjoyed qualified immunity from the Section 1983 claim because the woman failed to establish that the officer used "excessive force." Evaluating the battery claim, *Sullivan* held that Florida's "clearly excessive" standard for a battery claim against an arresting officer is "similar" to the "excessive force" standard used to evaluate a Section 1983 claim. Because of the "similar standard," *Sullivan* determined that the force used by the officer "was not clearly excessive . . . under Florida law."

- 16 -

*Sullivan* and the decisions that rely on *Sullivan* are not persuasive.[6] *Sullivan* lacks any discussion — and cites no decision — explaining why the use of a "similar standard" in Florida tort law and in federal constitutional law compels the same result when evaluating a claim under each.  A tort claim and a constitutional claim are evaluated under different law.  A federal court evaluating a state-law claim must apply the substantive law of the state in which that court is located.  *Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)); *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1259 (11th Cir. 2015).  Accordingly, Florida tort law governs a battery claim "heard on the basis of supplemental jurisdiction."  *Jones v. United Space All., L.L.C.*, 494 F.3d 1306, 1309 (11th Cir. 2007).  In contrast, a court evaluating a federal constitutional claim applies federal law interpreted by the Supreme Court.[7]  Although Article I, Section 12, of the Florida Constitution directs that the right under the Florida Constitution protecting each person from unreasonable searches and seizures is "construed in conformity with the [Fourth] Amendment to the United States Constitution, as interpreted by the United States Supreme Court[,]" a claim for battery under state tort law is distinct from either a federal or state constitutional claim for an unreasonable seizure,

---

[6] *McNamara v. Government Employees Insurance Company*, 30 F.4th 1055, 1061 (11th Cir. 2022), explains that unpublished decisions by the Eleventh Circuit are not binding and that a district court should determine whether an unpublished decision is persuasive before relying on the unpublished decision.

[7] District courts within the Eleventh Circuit are bound both by decisions of the Supreme Court and by published decisions of the Eleventh Circuit. *Fishman & Tobin, Inc. v. Tropical Shipping & Const. Co.*, 240 F.3d 956, 965 n.14 (11th Cir. 2001); *Motorcity of Jacksonville, Ltd. v. Se. Bank N.A.*, 120 F.3d 1140, 1143 (11th Cir. 1997).

and the standard for a battery claim is not necessarily identical to the standard for a constitutional excessive force claim. *See Gomez v. Lozano*, 839 F. Supp. 2d 1309, 1323 (S.D. Fla. 2012) (explaining that the parties wrongly assumed that the same excessive force standard applied to both a claim for battery under Florida law and a Section 1983 claim). A Section 1983 claim, such as Smola's claim against Thompson, is "a species of tort liability." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994). But species within the same genus often bear striking differences.

For example, an arresting officer might enjoy qualified immunity from a Section 1983 claim but not from a claim under state tort law. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Thompson enjoys qualified immunity from liability on Smola's Section 1983 claim. Whether an arresting officer enjoys qualified immunity "is generally a question of law for the court rather than a question of fact for a jury." *Thompson v. Douds*, 852 So. 2d 299, 304 (Fla. 2d DCA 2003). But Smola asserts his battery claim under Florida law and against Chronister, not Thompson. Because he is sued in his official capacity, Chronister enjoys no qualified immunity. *Heggs v. Grant*, 73 F.3d 317, 319 n.5 (11th Cir. 1996). Further, "[f]ederal qualified immunity does not apply to state-law claims," such as Smola's battery claim under Florida law. *Tuttle v. Sepolio*, 68 F.4th 969, 976 (5th Cir. 2023); *Riebsame v. Prince*, 267 F. Supp. 2d 1225, 1231 (M.D. Fla. 2003), *aff'd*, 91 Fed. Appx. 656 (11th Cir. 2004). Unlike the application of qualified immunity, which is generally a question of law, whether an officer's use of force was "reasonably necessary" under Florida law "is an issue of fact for the jury to determine." *Ansley v. Heinrich*, 925 F.2d 1339, 1343 (11th

- 18 -

Cir. 1991) (citing *City of Winter Haven v. Allen*, 541 So. 2d 128, 136 (Fla. 2d D.C.A. 1989)); *Gomez*, 839 F. Supp. 2d at 1323 (citing *Dixon v. State*, 132 So. 684, 688 (Fla. 1931)).

Because of the differences between a federal constitutional claim and a Florida tort claim, the use of a "similar standard" in each might not compel the same result. But the standard used to resolve a question of Florida tort law is better decided by a Florida court, not a federal court. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1296 (11th Cir. 2018) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)), counsels that "[w]hen [each] federal claim[] [is] dismissed before trial, a district court should typically dismiss [any] pendant state claim[] as well." Dismissal of Smola's battery claim is warranted. A Florida court is better situated to determine whether a constitutional claim and a Florida battery claim share the same standard and whether a determination that force is not "clearly excessive" under a constitutional claim compels the determination that force is not "clearly excessive" under a Florida battery claim against an arresting officer. *Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 863 (11th Cir. 2022) ("[C]oncerns of federalism — namely, of federal courts of limited jurisdiction weighing in on state law — counsel in favor of dismissing state-law claims after the federal claims are dismissed.).

## CONCLUSION

For these reasons and others stated by Thompson, Thompson's motion (Doc. 29) for summary judgment is **GRANTED**, and Chronister's motion (Doc. 28) for summary judgment is **DENIED**. That is, summary judgment is granted as to

Smola's Section 1983 claim against Thompson but denied as to Smola's Florida battery claim against Chronister.  The clerk must enter a judgment for Jack Thompson and against Joshua Smola as to Count II.  Because Smola's only remaining claim is a battery claim under Florida law, the Florida battery claim is **DISMISSED WITHOUT PREJUDICE** in accord with 28 U.S.C. § 1367.  This order declines supplemental jurisdiction over the remaining battery claim under Florida law, but the claim is dismissed without prejudice to Smola's right to assert the claim in a Florida court.  Each pending motion is **DENIED AS MOOT**.  The clerk must terminate each pending motion and must close the case.

ORDERED in Tampa, Florida, on March 8, 2024.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE